## UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

IN RE:                          *
                                *
RJC INDUSTRIES, INC.,           *      Chapter 11
            Debtor              *
                                *      Case No.: 1-96-00012
                                *
                                *
                                *

### MEMORANDUM AND ORDER

### Procedural History

On January 3, 1996, RJC Industries, Inc. (Debtor-in-Possession) filed a Petition under Chapter 11 of the Bankruptcy Code. On February 6, 1996, a Motion for Relief from Stay was filed on behalf of Armstrong Cabinet Shop, Inc. and American Stair Products, Inc. (hereinafter "the Companies"), businesses owned in whole or in part by Mr. Sam Armstrong (Armstrong). On February 26, 1996, the Debtor-in-Possession answered this Motion.

On March 7, 1996, the Debtor-in-Possession filed a Motion to assume the lease of the business premises. On March 21, 1996, the Companies filed an Answer opposing assumption of the lease.

On April 23, 1996, the Debtor-in-Possession filed a Motion for extension of the exclusivity period. On May 2, 1996, the Companies filed an Answer opposing this Motion.

On May 14, 1996, I heard testimony on all three (3) of these matters, all of which are ready for decision.

I have jurisdiction over these matters, all of which are core in nature, pursuant to 28 U.S.C.§ 157(b)(2)(G)(as to the motion to lift stay), §157(b)(2)(M)(as to the motion to assume lease), and §157(b)(2)(L)(as to the motion to extend the

AO 72A
(Rev. 8/82)

exclusivity period) and 28 U.S.C. §1334.

## Findings of Fact

1.     On September 28, 1994, Armstrong entered into an Asset Purchase Agreement (APA) for the sale of the Companies to R. John Chapel, Jr. (Chapel).     The total purchase price was $2,091,719.00.

2.     The equipment and machinery used by the Companies in the manufacturing of certain stair and cabinet products were included in the sale.

3.     The total valuation allocated to the machinery and equipment at the time of sale was $800,000.00.   This was a figure negotiated between the parties.

4.     The sale was financed by Armstrong by means of a twenty (20) year note secured by certain equipment itemized on a schedule attached to the APA.

5.     The APA stated that all machinery and equipment had been maintained in accordance with normal industry practice, and was in good condition.

6.     At settlement, Chapel paid $400,000.00 in cash for the accounts receivable, with any residual to be applied toward inventories.   The balance of the sale price, $1,691,719.00, was to be paid pursuant to the terms of the twenty year note.   The first twelve (12) payments were to be for interest only.

7.     At the time of sale, Chapel and Armstrong also executed a lease agreement for the real property on which the companies operated.

2

AO 72A
(Rev. 8/82)

8. The term of the lease was five years. The rent was $100,000.00 payable in monthly installments of $8,333.33.

9. The lease was assignable. Under the terms of a Modification Agreement (MA) entered between Armstrong and Chapel on August 28, 1995, an assignment would result in an increase in rent to $10,000.00 per month.

10. The MA also reduced the total purchase price of the APA to $1,683,057.24.

11. No principal has ever been paid on this debt.

12. The MA resulted from Armstrong's belief that a reduction in the total purchase price would result in principal payments being made.

13. The MA expressly voided the notes by which the APA was financed. In their place, two new notes were issued, one for $1,000,000.00, the other for $200,000.00.

14. The $1,000,000.00 note was secured by "Seller's existing security interest in the machines and equipment, which arose from the APA". The $200,000.00 note was similarly, but not identically, secured.

15. On September 14, 1995, Chapel and John Lombardozzi (Lombardozzi) executed a Stock Purchase Agreement (SPA) in which Lombardozzi paid $100,000.00 for all outstanding shares of RJC Industries.

16. At some point prior to the SPA, a document was prepared on behalf of RJC Industries in which the equipment and machinery were valued at approximately $800,000.00.

3

AO 72A
(Rev. 8/82)

17.   Some of the equipment and machinery has been removed from daily use and stored such that it is either partially or fully exposed to the elements.

18.   Lombardozzi has kept all lease payments current.

19.   After acquiring RJC, Lombardozzi began to make monthly payments to Armstrong.

20.   He intended these to be interest payments on the equipment and machinery based on a valuation of that equipment at $500,000.00.

21.   Lombardozzi arbitrarily selected $500,000.00 as a median between his valuation of the equipment and Armstrong's.

22.   Armstrong worked in the cabinet and stair making industries for 36 years, during which time (and continuing to the present) he attended equipment and machinery auctions.   He estimates the value of the equipment and machinery at RJC Industries to be over $800,000.00 and would estimate its replacement cost at more than $1,200,000.00.

23.   Daniel O. Boose (Boose) is employed by Richard Byrnes Co. (Byrnes), a woodworking machinery dealer, as a salesperson of such machinery.   He sometimes performs appraisals in the course of his duties.

24.   Boose attends auction sales of woodworking equipment, but not on a regular basis. Kevin Walsh (Walsh), the owner and the sales  manager of Richard Byrnes Co., attends such sales regularly.

25.      Boose  and  Walsh  appraised  RJC's  equipment  for

4

Armstrong.

26.  To perform their appraisal, they examined each piece of machinery on the RJC premises, assessing its condition and noting serial numbers and other identifying information.

27.  To arrive at fair market value for a piece of machinery, they used retail prices from current catalogues and reduced them by 35-50%, depending on current demand.

28.  Boose is unaware of any publication that contains a comprehensive listing of resale values for used woodworking equipment.

29.  Certain pieces of equipment were fully or partially exposed to the elements at the time of the Byrnes evaluation. He generally noticed that some equipment had been damaged or otherwise improperly stored, but noted no specifics as to this in his appraisal report.

30.  Byrnes found the total fair market value of all of the equipment, including equipment over which there was no perfected security interest, to be $863,000.00. According to the figures in Byrnes' report, the total fair market value of the equipment over which there was a perfected security interest was $470,570.00.

31.  Armstrong has a perfected security interest only in that equipment indicated on the list that he filed with the county prothonotary's office.

32.  Ben Holder (Holder) is a vice-president and senior appraiser for MACI Auctioneers. He is certified as an appraiser

5

AO 72A ⊕
(Rev. 8/82)

by the Certified Appraisers Guild of America. On several occasions in the past eight years he appraised equipment similar to RJC's.

33. On March 27, 1996, he physically examined the equipment over which Armstrong had a perfected security interest.

34. The machinery and equipment which he examined was in fair to good condition, except that there were no preservation efforts made prior to storage of some of the equipment.

35. In arriving at his total appraisal estimate of fair market value he used the "market data approach", which is a comparison of the sales price for similar equipment in the same geographic area.

36. For purposes of his appraisement, he would equate auction prices with liquidation values.

37. To arrive at some valuations, Holder used "The Machine and Equipment pricing Guide of 1995", which contains a listing of recent sales at auction of specific equipment. Approximately 30% of RJC's equipment was listed in this Guide.

38. For the other 70% of RJC's equipment, Holder's pricing figures reflect his examination of trade publications listing dealer prices for similar equipment. It also reflects his contacting other appraisers to determine their knowledge of recent sales of similar equipment.

39. Holder's testimony (as to the quotes he obtained from other appraisers) did not indicate whether the appraisers he contacted gave him fair market values or liquidation values. His

6

AO 72A ⊕
(Rev. 8/82)

testimony was given on behalf of Lombardozzi.

40. To arrive at fair market values, Holder calculated figures approximately 30% above liquidation values.

41. In providing his estimates, Holder did not take into account the devaluation of the equipment from exposure to the weather.

42. Holder's appraisal of the fair market value of RJC's equipment over which there was perfected security interest was $301,411.00.

43. RJC has been paying all post-petition taxes and bills as they became due, but RJC continues to operate at a loss.

44. RJC has no other suitable facility available to house its operations.

45. The continued lease of Mr. Armstrong's real property is necessary to an effective reorganization.

## Discussion

Before me are several issues involving the continuing operations of the Debtor, RJC Industries. Specifically, Armstrong, an under secured creditor, seeks to lift the stay in order to either retake certain collateral machinery or to receive some form of adequate protection. He also requests that I disallow the Debtor from assuming the lease of the business premises, and he objects to the extension of the exclusivity period. I will address the lift stay motion first.

### I. REPOSSESSION OF THE EQUIPMENT

To lift the stay, a creditor must prove (1) the amount of

AO 72A
(Rev. 8/82)

his claim, (2) that his lien is perfected, and (3) that the debtor lacks equity in the property. _In re Jug End in the Berkshires, Inc._, 46 B.R. 892, 901 (Bankr. D. Mass., 1985). To keep the stay despite such proof, a debtor must prove the property necessary for an effective reorganization. _In re Elmira Litho, Inc._, 174 B.R. 892, 901 (Bankr. S.D. N.Y. 1994).

To meet his burden, "the debtor must do more than merely assert that the property is necessary . . . ." _Jug End_, at 902. "If all the debtor can offer . . . is high hopes without any financial prospects on the horizon to warrant a conclusion that reorganization in the near future is likely, it cannot be said that the property is necessary to an effective reorganization." _Jug End_, at 902, _citing_, _In re Clark Technical Associates, Ltd._, 9 B.R. 738 (Bankr. D. Conn. 1981). In considering the debtor's burden, however, "a court should not precipitously sound the death knell for a debtor by prematurely determining that ... prospects for economic revival are poor." _In re Shockley Forest Industries, Inc._, 5 B.R. 160 (Bankr. M.D. Tenn. 1980). Moreover, a determination of reorganizational prospects is usually made only after a plan had been filed, _see In re Craddock-Terry Shoe Corp._, 98 B.R. 250 (Bankr. W.D. Va. 1988).

A plan is not yet filed before me. Post-petition bills are being paid as they come due. Lombardozzi intends to have his other company, Signature Kitchens, purchase RJC products, which will comprise 10% to 15% of RJC's business. RJC has shut down its unprofitable commercial cabinet shop and had laid off excess

AO 72A
(Rev. 8/82)

employees. Signature Kitchens' largest customer has agreed to shift its stair business (approximately $700,000.00 per year) to RJC. Thus, RJC has offered financial prospects on the horizon to warrant a conclusion that reorganization is likely soon. The manufacturing equipment is obviously indispensable to the continuing manufacturing of products for the business. Therefore, I find that prospects for reorganization are reasonable, and that the equipment is necessary thereto.

Therefore, Armstrong's Motion is denied insofar as it seeks to retake the collateral equipment.

## II. ADEQUATE PROTECTION

### A. Criteria for Requiring Adequate Protection

Mr. Armstrong believes that his collateral is depreciating through use and improper maintenance while he has received no counterbalancing payments on the principal. He would prefer to get the equipment back, but since he cannot, his interest against devaluation must be protected in some other fashion. Since the transfer of RJC's stock, Lombardozzi has been providing what he considers to be adequate protection payments. The issue here is whether those payments are in fact adequate.

A secured creditor is entitled to "the most indubitable equivalence" of his lien before a debtor can use collateral in a plan of reorganization over that creditor's objection. In re Murel Holding Corp., 75 F.2d 941, 942 (2d Cir. 1935). In a Chapter 11 case, value, for adequate protection purposes, is measured on the date of the Petition. In re Reddington/Sun Arrow

9

Ltd. Partnership, 119 B.R. 809, 812-813 (Bankr. D. N.M. 1990).
A debtor must protect the collateral against depreciation post
petition. If depreciation is nonetheless occurring, a secured
creditor may seek adequate protection through periodic payments,
priority claims or replacement liens on new collateral. United
Savings Association of Texas v. Timbers of Inwood Forest Assn.,
Ltd., 484 U.S. 365 (1988). In adequate protection proceedings
the debtor has the burden of proof. In re Tudor Motor Lodge
Assoc., Ltd., 102 B.R. 936, 952 (Bankr. D. N.J. 1989); citing 11
U.S.C. §362(g). The debtor must show that if it were sold, the
equipment would provide the creditor with funds equal to the
value of the equipment on the day of the petition.

Determining if an interest is adequately protected involves
three basic steps: (1) establishment of the value of the secured
creditor's interest; (2) identification of the risks to the
secured creditor's value; and (3) determination of whether the
debtor's adequate protection proposal protects value as nearly as
possible. In re Martin, 761 F.2d 472 (8th Cir. 1985).

Of course, establishing a value of Armstrong's interest
requires an assessment of the appraisals in evidence, which I
will do below. As to identifying the risks to Armstrong's value,
because RJC has made no payments on the equipment in use,
whatever the value of the equipment is, it is at risk through
depreciation. In addition, Armstrong has provided unrebutted
evidence that some of the equipment is stored haphazardly and so

10

AO 72A ⊕
(Rev. 8/82)

is further at risk.[1]  Thus, I find that adequate protection is warranted.  Below I will also address the issue of whether RJC's adequate protection proposal protects the collateral's value as nearly as possible.

## B.  Formulae for Valuation of the Collateral

The Commission on Bankruptcy Laws of the United States recommended that adequate protection be measured solely by the liquidation value as of the petition date.  <u>Report of the Commission on Bankruptcy Laws of the United States</u>, H.R. Doc. No. 137, 93rd Cong., 1st Sess. Pt. II, at 237 (1973).  As the legislative history indicates, however, Congress favored a more flexible, case by case approach.  <u>In re Beker Industries Corp.</u>, 58 B.R. 725, 737-738 (Bankr. S.D. N.Y. 1986).  [E]specially [in] a reorganization case, the determination of . . . [the use of] going concern value or liquidation value must be based on equitable considerations arising from the facts of the case."  S. Rep. No. 989, 95th Cong., 2d Sess. 54 (1978).  A bankruptcy court has considerable discretion in determining the appropriate method of valuation.  <u>Beker</u>, at 725; <u>In re Kennedy Mortgage Co.</u>, 23 B.R. 466, 9 B.C.D. 805 (Bankr. D. N.J. 1982).  What will constitute "value" for a given item of property in use by the estate will

---

[1] Certain items over which Mr. Armstrong has a perfected security interest are listed in both appraisers' lists as being in the "shed" or "shed area."  Given the impossibility of knowing what particular areas under the "shed" would provide complete protection from the vagaries of the elements, I find that all equipment stored in the "shed" or "shed area" is not being properly maintained for purposes of this proceeding.

11

AO 72A  ⊕
(Rev. 8/82)

depend upon the context, the circumstances of the parties and the procedural point at which the issue is raised. H.R. Rep. No. 595, 95th Cong., 1st Sess. 356 (1977).

A key circumstance to be examined is the likelihood of reorganization. If the debtor shows that reorganization is likely, then going concern value should be used to determine what constitutes adequate protection. In re QPL Components, Inc., 20 B.R. 342, 345 (Bankr.E.D. N.Y. 1982); In re Philadelphia Consumer Discount Co., 37 B.R. 946, 949 (Bankr. E.D. Pa. 1984). "For adequate protection purposes, valuation is viewed from the creditor's perspective -- i.e. . . . what would he receive for the equipment if allowed to repossess it." In re WPRV-TV, 102 B.R. 228 (Bankr. E.D. Okla. 1988).

"It is very difficult, if not impossible, to attribute a going concern value to an individual piece of property. Theoretically, it is an impossibility." In re Unimet, 74 B.R. 156, 166 (Bankr. N.D. Ohio 1987) Thus, for adequate protection purposes in a Chapter 11 case, going concern values and fair market values are sometimes considered equivalent. In re Automatic Voting Machine Corp., 26 B.R. 970, 972 (Bankr. W.D. N.Y. 1983); In re Rogers Development Corp., 2 B.R. 679 (Bankr. E.D. Va. 1980), In re Shockley Forest Industries, Inc., 5 B.R. 160 (Bankr. N.D. Ga. 1980); In re American Kitchen Foods, 9 C.B.C. 537, 2 B.C.D. 715 (N.D. Me. 1976).

"The valuation process is, at best, inexact.... The Court must consider estimates and approximations founded on opinions

12

AO 72A ⊕
(Rev. 8/82)

and assumptions. . . . The adequacy of protection. . . must ultimately be determined upon equitable considerations . . . of each proceeding." <u>In re High Sky, Inc.</u>, 15 B.R. 332, 336 (Bankr. E.D. Pa. 1981). <u>See also</u>, <u>In re Snider Farms, Inc.</u>, 79 B.R. 801 (Bankr. N.D. Ind. 1987) (Valuation of property is not an exact science and court is not bound by professional opinion.)

As I discussed earlier, improvements have been made in RJC's operations, debts are being paid as they become due, and RJC's customer base has broadened. Thus, I find that RJC Industries is a going concern, and the equipment that it is using is entitled to going concern value.[2]

In the case before me, however, no going concern valuations have been provided. In accord with the cases equating fair market values and going concern values, and in view of the discretion afforded me by Congress regarding the appropriate method of valuation, I will use the fair market values provided by the experts to determine the value of RJC's equipment.

C. <u>Burden of Proof as to Adequacy of RJC's Offered Protection</u>

The secured creditor asserting a need for adequate protection must "prove [a] decline in value -- or the threat of a decline -- in order to establish a prima facie case." <u>Elmira</u>

---

[2]Fair market value is defined as 'the price [on] which a willing buyer and willing seller agree, neither being under any compulsion to buy or sell, and both having a reasonable knowledge of the relevant facts. 26 C.F.R., §1.170A-1(c)(2) <u>cited in</u> <u>In re Unimet Corp.</u>, 74 B.R. 156, 166 (Bankr. N.D. Ohio 1987). "Going concern value is the additional element of value which attaches to property because of its existence as an integral part of a going concern." <u>Unimet</u>, at 166.

13

AO 72A
(Rev. 8/82)

Litho, at 902. A threat of a decline in value would include the "failure to keep the property in a good state of repair." In re Brown, 78 B.R. 499 (Bankr. S.D. Ohio 1987):

> Once the movant satisfies this initial burden, the burden shifts to the debtor to go forward with evidence, and ultimately, to prove that the collateral is not declining in value, or that the secured party is adequately protected through periodic payments, an equity cushion, additional or replacement liens. . . .

Elmira Litho, at 902.

Regarding the prima facie burden, "the most persuasive proof of declining value is quantitative . . . .appraisal or similar evidence showing that the collateral at the beginning of the case was worth more than it . . . will be worth at some future date." Elmira Litho, at 903. A secured creditor can also sustain its burden qualitatively by showing that the debtor has "substantially failed to make post-petition payments." Id.

In the matter before me, both parties generally concede that the overall value of all equipment and machinery has decreased over time through use. It is also admitted that no payments have been made on the principal. Thus, I find that Armstrong has satisfied its prima facie burden.

Lombardozzi testified that he has "voluntarily" been making periodic interest payments on the equipment based on the contract interest rate, 8%, and a "valuation" of the equipment at $500,000.00, which he figured was "a midpoint" between his beliefs as to its worth and Armstrong's. He testified that these

14

AO 72A
(Rev. 8/82)

payments were about $2950.00 per month.[3] Lombardozzi conceded that he had no expertise in the woodworking machinery industry and "really didn't have any idea what the equipment was worth."

Whether these payments are sufficient protection depends on the value of the equipment. The appraisal reports' lack of uniform labelling of the individual pieces of equipment complicates the valuation process. However, I am mindful not only of Armstrong's need of payments in order to meet other obligations, but also of the Debtor's need to have his equipment valued so that he can formulate his plan. Therefore, I will value the equipment based on the information in the record.[4]

### D. Valuations and Adequate Protection Payments

Armstrong did not contest Holder's testimony that his appraisal list was reproduced from a list supplied by Lombardozzi, who obtained it from the prothonotary's office. Thus, I am bound to conclude that Armstrong has a perfected security interest only in the equipment listed on Holder's appraisement. Armstrong may be protected only as to collateral

---

[3]Based on a $500,000.00 debt at 8% interest, the actual payment should have been $3,333.33 per month.

[4]In In re WPRV-TV, INC., supra, a secured creditor, RCA, sought to lift the stay in order to repossess equipment, but provided no evidence as to removal costs (which would reduce its relative value, in turn reducing the margin of adequate protection). Without expert testimony, the court determined that such costs would not be considered in its opinion. See also In re Xinde Intern, Inc., 13 B.R. 212 (Bankr. D. Mass. 1981) (Secured creditor seeking adequate protection of lien failed to provide expert going concern valuations. Court used fair market valuations instead.)

15

AO 72A
(Rev. 8/82)

over which he has a perfected lien. See, In re Jug End, supra.

I cannot conclude that one appraiser in this case was more credible than the other. Holder has a certification credential, but the Commonwealth of Pennsylvania does not provide it and the record lacks any evidence as to the experience it requires. Thus, I do not know the true value of the credential. Although Holder referred to a "book" of equipment valuations, it had prices for only about 30% of RJC's equipment and the appraisement bore no indicia of which values were the "book" values. Thus, "the book" is of no special moment in this proceeding. Most of the valuations by both experts were based on their observations at auctions and their review of records of recent sales of similar equipment in the course of their business duties. Finally, neither appraisal specifically took into account an individual piece's potential devaluation from exposure to the elements. For all of these reasons, I cannot find one appraiser's figures more worthy than the other's.

Because of these problems, my valuation requires three steps. First, I will determine the fair market value of the equipment which has been properly stored and against which there exists a perfected lien by averaging each appraiser's fair market value figure. Then, as to the equipment which has not been properly stored, I will apply the replacement value. I will then add these figures to arrive at a total valuation for purposes of calculating adequate protection payments.

MACI's total fair market value for the equipment which it

16

AO 72A
(Rev. 8/82)

showed as being in the "Shed" or "Behind Shed" was $18,490.00. The total fair market value of _all_ properly liened equipment was $301,411.00. Thus the total fair market value of the properly stored equipment was $282,921.00. The total[5] fair market value reached by Byrnes for that same equipment was approximately[6] $422,520.00[7]. The average of the two figures is $352,720.00. As to those pieces listed by MACI as being held in the "shed" or "behind shed", since no replacement values were supplied by MACI, I will use the Byrnes figure. The total replacement value for those pieces is $119,795.00. Thus, the total appraisal value is $472,515.00. To this I will add 10% for going concern values. Thus the total is $519,766.50.

The APA provided for interest at a rate of 8%. At the above valuation, this rate would provide for payments of $41,581.32 per

_____

[5]As indicated in my findings of fact and as discussed above, the sum total figure for all equipment appraised by Byrnes was actually $863,000.00. That figure included, however, values for equipment over which the security interest was not perfected. Thus, I cannot use that figure here.

[6]The appraisal lists did not identify each item in exactly the same terms. Therefore, I was unable to find a corresponding value on the Byrnes' list for each item on the MACI list. For these items, I used the MACI fair market value, added 32% (the percentage difference between each appraiser' total value estimate for all equipment for which there were corresponding descriptions) and then averaged the two figures. For some items the Byrnes' figure was illegible on the copy in evidence. For these items, I used only the MACI value for purposes of the Byrnes' total.

[7]To reach this figure, I used Byrnes' total fair market value for all properly liened equipment, $470,570.00 and subtracted Byrnes' fair market values for the improperly stored equipment, which totalled $48.050.00.

17

AO 72A  ⊕
(Rev. 8/82)

year or $3,465.11 per month to be made from the Debtor to Armstrong. In the Order which will accompany this Memorandum, I will require the Debtor to maintain those payments to Armstrong until the Debtor's Plan is confirmed and he commences Plan payments.

## III.   ASSUMPTION OF THE LEASE

Section 365 allows a debtor-in-possession to assume or reject any unexpired lease. See generally, In re Orion Pictures Corp., 4 F.3d 1095 (2d Cir. 1993). If there has been a default, no assumption can occur unless, at the time of assumption, the default is cured or adequate assurances are given that it will be cured and that a default will not recur.

The law gives the debtor-in-possession discretion as to assumption of a lease. In reviewing that decision, a bankruptcy court acts essentially to oversee the wisdom with which the property is being managed, not to arbitrate disputes between creditors and the estate. Id, at 1099.

RJC asserts that assumption of the lease is essential to an effective reorganization. Given the evidence regarding the amount of equipment used in the business and the costs associated with its removal and transportation to another site, it is difficult to question the wisdom of the assumption.

Armstrong counters with several arguments. First, he asserts that reorganization at the current location is unlikely and that the current premises are too large for the business. Second, he avers that the lease was breached by Chapel's sale

18

AO 72A
(Rev. 8/82)

of RJC's stock to Lombardozzi because that sale effectively resulted in an assignment without the required lessor consent. The lease provides for a rent increase to $10,000.00 per month upon assignment. Armstrong alternatively argues that the sale of the stock at least entitles him to that increased payment. Finally, Armstrong alleges that the leasehold premises have been substantially altered, that hazardous materials are being improperly stored or dumped there, and that "it is not clear" that current insurance is being properly carried.[8]

None of the above reasons provide cause to prohibit assumption of the lease. First, I cannot overrule the debtor-in-possession's discretion simply because of excess space. Second, as to the assignment issue, the APA provides that "[n]o party may assign either the [Asset Purchase] Agreement or any of its rights, interests, or obligations without the prior written approval of the other party." The Modification Agreement acknowledges that the lease is assignable but that, upon assignment, the monthly rent will become $10,000.00 for the base rental period. Despite the fact that the APA spelled out in thirty-three pages the rights and duties of each of the parties, there is nothing in it (or for that matter the Lease or Modification Agreements) that provides for a forfeiture in the event that ownership of RJC changed hands. Moreover, the Modification Agreement specifically acknowledged that the

---

[8]In his brief, Armstrong does not further pursue the insurance issue.

AO 72A
(Rev. 8/82)

Debtor would "pursue . . . the sale of the company." Thus, Armstrong expressly understood that the corporate entity could change ownership entirely. He made no provision, however, for a change in ownership to be considered an assignment.

In <u>Alabama Vermiculite Corp. v. J.T. Patterson</u>, 124 F.Supp. 441 (D.C. W.D.S.C. 1954), Patterson became a party to a lease which prohibited all assignments except to Alabama Vermiculite Company (AVC). About a year thereafter, all shares of AVC were sold in a corporate buy out. When AVC sued for certain breaches of the lease, one of Patterson's defenses was that the lease was no longer enforceable because it was effectively nullified by the transfer of AVC's stock -- that AVC was no longer the AVC contemplated by the agreement.

The court concluded as a matter of law that "the sale of the stock of plaintiff corporation . . . did not amount to an assignment . . . in violation of the provisions . . . [requiring] written consent of the lessor. . . . Corporations, being artificial creatures of the law, by their very nature hold certain powers not possessed by individuals." <u>Id.</u>, at 445.

> The ordinary restriction against tenant-transfer is aimed at transfers of the leasehold interest. It does not bar transfer of stock control of a corporate tenant. Thus, the ordinary non-assignment clause, no matter how well drawn otherwise, may be circumvented in the case of a corporate tenant by a change in stock control. . . .

1 M. Friedman, <u>Friedman on Leases</u> §7.3031 (2d ed. 1983); <u>cited in In re Ames Department Stores, Inc.</u>, 127 B.R. 744 (Bankr. S.D. N.Y. 1991).

20

Non-assignment clauses are solely for the benefit of the lessor--to allow him to know and approve of any party with whom he is dealing as a lessee. It prohibits a lessee from surprising the lessor with an undesirable tenant. In the matter before me, Armstrong executed a Modification Agreement regarding the APA after the Debtor defaulted on several payments. In the Modification Agreement, he specifically agreed (and probably hoped) that RJC would pursue "the sale of the company". He also recognized that the lease was assignable. Although he may have presumed that the APA's non-assignment clause effectively required that he approve any stock purchaser as well, his presumption was in error.

An assignment is an assignment and a sale of stock is a sale of stock. They are two entirely different transactions. The assignment clause gave Armstrong no rights over the sale of RJC's stock. The original lease agreement, the APA and the MA are all between Armstrong and RJC Industries, Inc. Those agreements continue in legal effect to be between Armstrong and RJC Industries, Inc. The parties have not changed. No assignment has effectively occurred. Therefore, I do not find that the lease has been breached by an unapproved assignment such that Armstrong may retake the leasehold premises. Similarly, I cannot find that an assignment has occurred such that Armstrong is entitled to a contractual increase in rent.

Although Armstrong pursued some questioning in the hearing regarding improper storage and disposal hazardous materials on

AO 72A  ⊕
(Rev. 8/82)

the leasehold premises, I find insufficient evidence in the record to find that such occurred or that a material breach occurred as a result. Armstrong presented little in his brief in the way of argument on these points.

## IV. EXTENSION OF THE EXCLUSIVITY PERIOD

The Debtor-in-Possession has indicated that my equipment valuations will allow him to quickly produce a plan of reorganization. I will therefore allow him forty-five (45) days from the date of this order to file a viable plan.

An appropriate order will follow.

BY THE COURT:

Hon. Robert J. Woodside
Chief Bankruptcy Judge

HARRISBURG, PENNSYLVANIA
DATED: MAY 1 2 1997

AO 72A
(Rev. 8/82)

# UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

IN RE:                              *
                                    *
RJC INDUSTRIES, INC.,               *    Chapter 11
                     Debtor         *
                                    *    Case No.: 1-96-00012
                                    *
                            **ORDER**

**AND NOW,** this 12th day of May, 1997, the following order is hereby entered:

The Motion for Relief from the Automatic Stay filed by Mr. Sam Armstrong is denied insofar as it seeks to take action against equipment over which he has either a perfected or unperfected security interest. That Motion is granted insofar as it seeks adequate protection payments to be made by the Debtor-in-Possession. RJC Industries is hereby Ordered to commence monthly payments of $3,465.11 to Mr. Armstrong until its Plan is confirmed and it commences Plan payments.

The Debtor-in-Possession's Motion to Assume the Lease is hereby granted.

The Debtor-in-Possession's Motion for extension of the exclusivity period is hereby granted. The Debtor-in-Possession shall file a viable Plan of Reorganization within forty-five (45) days of the date of this Order.

                                        **BY THE COURT**

                                        _Robert J. Woodside_
                                        HON. ROBERT J. WOODSIDE
                                        CHIEF BANKRUPTCY JUDGE

HARRISBURG, PENNSYLVANIA

AO 72A
(Rev. 8/82)