UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

IN RE:
RJC INDUSTRIES, INC.,
    Debtor

Case No.: 1-96-00012

CHARLES A. BIERBACH, TRUSTEE
of the ESTATE OF RJC
INDUSTRIES, INC.,
    Movant

Chapter 7

v.

OFFICE OF THE UNITED STATES
TRUSTEE,
    Objectant



FILED    HARRISBURG PA
AUG 14 2002
Clerk, U.S. Bankruptcy Court

*******************************

OFFICE OF THE UNITED STATES
TRUSTEE,
    Plaintiff

v.

JOHN LOMBARDOZZI,
    Defendant

Adv. No.: 1-01-00283

## MEMORANDUM and ORDER OF COURT

AND NOW, this /4/ day of Aug., 2002, upon consideration of: (a) the adversary complaint of the United States Trustee (UST) to determine the validity and nature of claim of John Lombardozzi (Lombardozzi); (b) the application of the Chapter 7 Trustee, Charles A. Bierbach (Bierbach) for compensation and proposal to abandon property of the estate; and (c) the UST's objection to Bierbach's proposal[1], it is hereby ORDERED, ADJUDGED and DECREED that (a) Lombardozzi has

---

[1] The UST did not object to Bierbach's application for compensation. It will be treated in a separate Order.

1


COPY

AO 72A
(Rev. 8/82)

an administrative claim in the amount of $112,051.00; (b) Bierbach's proposal to abandon is denied; (c) the UST's objection to the proposal to abandon Lombardozzi's note as valueless is sustained; and (d) the note is determined to have a value of $590,559.00. The rational for this Court's decision is set forth below.[2]

On the date it filed its bankruptcy petition, January 3, 1996, RJC Industries, Inc. (Debtor) was a manufacturer of stairway and kitchen related wood products. Already in financial trouble, RJC had been purchased by Lombardozzi in September, 1995. Lombardozzi sought to capitalize on animosity (due to payment delinquencies) between the seller, John Chapel (Chapel), and RJC's primary secured lender, the founder of the business, Sam Armstrong (Armstrong). Armstrong's debt was secured by various assets of the business, including its manufacturing equipment. Lombardozzi believed that he could salvage the business by negotiating better terms with Armstrong than Chapel could. When Lombardozzi was unable to do so, he filed the instant bankruptcy in order to coerce more favorable terms from Armstrong.

During the time the case was in Chapter 11, Lombardozzi proposed at least three Plans of Reorganization, each of which

---

[2] I have jurisdiction over these matters, which are core in nature, pursuant to 28 U.S.C.§157(b)(2)(A)(B) and (O), and 28 U.S.C. §1334.

2

Case 1:96-bk-00012-JJT   Doc 307   Filed 08/14/02   Entered 08/20/02 00:00:00   Desc
Converted from NIBS HB    Page 2 of 16

proposed to reduce the debt to Armstrong by returning some of the manufacturing equipment to him. Because the Debtor had improperly stored and damaged the equipment, the Court denied confirmation of each Plan. Lombardozzi was never able to confirm a Plan and so, on March 13, 2000, the case was converted to one in Chapter 7.

Charles Bierbach, Esquire (Bierbach) was appointed Trustee of the Chapter 7 estate. After the case converted, Lombardozzi proposed to purchase all of the assets of the estate, free and clear of liens and encumbrances. The consideration he offered in exchange for the sale was to be in the form of sufficient money to pay all of the administrative claims of the Chapter 11 estate. The value of Debtor's assets was $898,279.00.[3] The administrative claims against the Chapter 11 estate were averred to be in the amount of $1,365,812.00, with $1,170,143.00 being owed to Lombardozzi himself. Thus, only $195,669.00 in administrative claims existed to entities other than Lombardozzi.

The UST objected to the proposed sale, arguing that Lombardozzi did not have a valid administrative or secured claim and that, therefore, the consideration was insufficient

---

[3] The actual figure used in the sale Motion, $898,014.05, appears to be an arithmetical or typographical error. The sum of values of the equipment ($52,000.00), accounts receivable ($587,000.00), and inventory ($259,279.00) is $898,279.00. The value consistently given by the parties in later pleadings is $898,279.00. Thus, the Court concludes that $898,279.00 is the correct figure.

3

AO 72A
Rev. 8/82)

and the sale was not proposed in good faith.

No hearing was held on the sale motion, as the parties agreed to a stipulation, filed on January 20, 2000, which approved a sale to Lombardozzi on the condition that the Chapter 7 trustee and the UST would be free to investigate the basis for Lombardozzi's alleged administrative claims. If investigation revealed that such claims were not in fact administrative, then an objection could be filed against them. If the Court sustained the objection, then the claims would not be treated as administrative ones. To the extent that the claims would be determined to be non-administrative, the value that Lombardozzi would be "paying" for the assets of the estate would be concomitantly diminished. Thus, if none of his claims were valid administrative ones, then he would effectively be purchasing assets valued at $898,279.00 for only $195,669.00.

Since the sale was going to be consummated with the issue of the validity of Lombardozzi's administrative claims unresolved, the Stipulation required Lombardozzi to execute a note payable to the estate for the difference between the value of all administrative claims ultimately allowed (including Lombardozzi's) and $898,279.00. If the value of all administrative claims exceeded $898,279.00, then the note would be valueless. The note was duly executed and delivered to Bierbach.

According to Bierbach's Motion, he undertook as much of

4

an investigation of the validity of Lombardozzi's claims as the estate could afford. Since the estate's liquid assets were limited, his investigation was cursory. In the Motion now before the Court, Bierbach seeks to abandon the Note as being valueless. The UST objects to the abandonment, asserting that the note does have value, which amount is to be determined at trial of the instant adversary complaint.

A trial was held on July 1, 2002, at which the UST indicated that he intended not only to challenge the validity of Lombardozzi's claims as administrative ones, but also to assert that his claims should be equitably subordinated to those of general unsecured creditors. The Court decided that such a challenge would be moot if the claims were found to be valid administrative ones. Therefore, it was agreed that the case could be bifurcated, if necessary, and that the July 1 trial would focus solely on the issue of whether Lombardozzi held a valid administrative claim in any amount.

### Analysis

Under 11 U.S.C. §364(c)(2), a debtor-in-possession may obtain credit "secured by a lien on property of the estate that is not otherwise subject to a lien". Under 11 U.S.C. §364(d)(1), a debtor-in-possession may obtain credit secured by a "senior or equal lien on property of the estate that is subject to a lien". Sections 364(c)(2) and (d)(1) provide that a debtor already awash in debt may not further incur debt or encumber his property unless his creditors first have

5

notice and are heard. "[T]he Bankruptcy Code is quite clear that a debtor must seek court approval to obtain credit." *In re Lehigh Valley Professional Sports Clubs, Inc.*, 260 B.R. 745, 750 (Bankr.E.D.Pa. 2001). "[B]ecause power to authorize a lien under §364(d) is extraordinary, due process consisting of notice, hearing and court authorization is required." *Id.* at 750, quoting, *In re City Wide Press, Inc.*, 110 B.R. 710, 711 (E.D.Pa.1990) (other citations omitted.) "One who extends credit to a debtor without court authorization therefore does so at its own risk.... Only a foolhardy lender will attempt to make [*nunc pro tunc* approval] serve as a substitute for proper authorization. " *Lehigh Valley*, at 750.

To be sufficient, "notice must be reasonably calculated to bring to [an interested] party's attention the nature and substance of the pending determination." *In re Duggins* 263 B.R. 233, 240 (Bankr.C.D.Ill. 2001), citing, *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (emphasis added). Since the granting of post-petition financing can result in circumvention of these important notice requirements, "*nunc pro tunc* approval of ... a §364 application is reserved for extraordinary circumstances in the Third Circuit". *In re City Wide Press, Inc.*, 102 B.R. 431, 436 (Bankr.E.D.Pa.1989), aff'd, 110 B.R. 710 (E.D.Pa.1990).

At the core of the matter now before the Court, it is *nunc pro tunc* approval of post-petition loans that Lombardozzi

6

would be obtaining if certain infusions of cash which he now claims as Chapter 11 administrative expenses were to be treated as such for purposes of his purchasing the assets of the Chapter 7 estate. Lombardozzi asserts that he made three such cash infusions.

Lombardozzi claims that in 1996, he made cash advances to the Debtor amounting to some $350,000.00.[4] No applications to allow such advances (let alone to have them designated as administrative claims) were ever filed to meet the notice requirements of Section 364 as discussed in *Lehigh Valley, et al*, above. The evidence in the record to verify the existence of the averred advances is a note, dated a year later (December 23, 1997), payable to Lombardozzi himself in the face amount of $350,000.00 at 12% per year. The making of this note was disclosed in the December, 1997 monthly report.

The fact of disclosure in the monthly report is the evidence on which Lombardozzi most heavily relies for his argument that he has an administrative claim by virtue of having made a loan in compliance with §364(d). He asserts that such disclosure is tantamount to the notice and hearing required by the Bankruptcy Code and, therefore, is equivalent

---

[4] Lombardozzi himself advanced only $50,000.00. The remainder came from advances made by his father ($120,000.00) and by Signature Kitchens, Inc., one of Lombardozzi's other corporations, ($180,000.00). There is no documentary evidence that Lombardozzi himself paid off his father and Signature Kitchens and received an assignment of their claims.

7

to the filing of an Application under §364. His assertion is unfounded. As the UST effectively pointed out through cross examination, creditors are not served with monthly reports, and no hearing is held as a direct result of such reports. Therefore, the notice requirements of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure are not met by monthly reports.

Lombardozzi further argues that the doctrines of res judicata and collateral estoppel apply against the UST's objection and Complaint. He asserts that these doctrines apply because the matter of the approval of the loans was previously litigated - or at least made subject to possible objections - when the Debtor's Disclosure Statement was approved. He asserts that the UST's failure to raise any arguments against the validity of Lombardozzi's security interest through the loan disclosed in the Disclosure Statement precludes the UST from pursuing the instant matters.

This argument also has no merit. As Lombardozzi himself points out, for res judicata to apply, the causes of action in both the prior and current litigation must be identical. Identity of causes of action, for res judicata purposes, means identity of facts creating the right of action, and of evidence necessary to sustain each action. *In re Superior Used Cars, Inc.*, 258 B.R. 680 (Bankr.W.D.Mich. 2001); *In re Robinson* 256 B.R. 482 (Bankr.S.D.Ohio 2000). In the instant case, the cause of action in the Disclosure Statement

8

litigation dealt with the adequacy of information contained in that Statement to enable a hypothetical reasonable investor to make an informed judgment about whether the Plan is in his best interests. *See, In re Kelley, 199 B.R. 698, 703 (9th Cir.BAP 1996).* The litigation here deals with whether Lombardozzi may, *nunc pro tunc,* characterize certain cash infusions as loans. Obviously the evidence needed to sustain each action is far from identical.

Similarly, for collateral estoppel to apply, there must be identity of issues sought to be precluded. Again, the issues here are not identical to the issues in the Disclosure Statement litigation.

In short, Lombardozzi's infusion of capital, without prior court approval, must be treated as a businessman's investment into his business and not as a loan to it. Lombardozzi, however, is seeking here to be protected by the Bankruptcy Code after his investment did not provide a return. He wants to get the value of his investment back from the estate. He fails to recognize that the estate is an independent entity whose ability to pay bills is ultimately controlled by the Bankruptcy Court, which is compelled to consider the best interests of creditors. The creditors did not receive notice and a chance to inform the Court of their interests with regard to the investment. Thus, the Court cannot conclude that Lombardozzi should be protected in that investment, particularly at this juncture, when the business

9

has failed and the case has been converted.

For these reasons, the Court cannot find that Lombardozzi has an administrative claim based on the December, 1997 note in the amount of $350,000.00.

Lombardozzi also possesses a note from the Debtor that was given in exchange for a cash advance of some $450,000.00 in December, 1997. Part of this advance was made to enable the Debtor to pay off certain post-petition secured financing arrangements with third parties, Reservoir Capital Corp. (Reservoir) and Lifeboat, Inc. (Lifeboat). These financing arrangements had, in fact, been properly authorized by the Court. On January 28, 1998, Debtor filed a Motion to allow Lombardozzi to satisfy the claims of Reservoir and Lifeboat which had accrued against the estate, and to receive an assignment of those claims. No objections were filed to this Motion, and so it was approved on March 4, 1998. The Order approving the Motion stated that Lombardozzi was "authorized to pay the balances due and owing [Reservoir and Lifeboat]". According to Lombardozzi's brief, those balances due and owing were in the amounts of $192,384.00 to Reservoir and $80,000.00 to Lifeboat ($272,384.00 total).

In deciding whether to grant a request to obtain financing on a *nunc pro tunc* basis, the bankruptcy courts have applied the following four-pronged test: (1) whether it would have approved financing if timely application had been made; (2) whether creditors have been harmed by the continuation of

O 72A
Rev. 8/82)

Case 1:96-bk-00012-JJT    Doc 307    Filed 08/14/02    Entered 08/20/02 00:00:00    Desc
Converted from NIBS HB    Page 10 of 16

business made possible by loan; (3) whether the debtor and the lender honestly believed that they had authority to enter into transaction; and (4) whether there is something more compelling in the nature of the equities and the absence of prejudice to interested parties to allow such extraordinary relief. *Lehigh Valley*, at 751 (citations omitted).

Applying these factors to the instant case, the Court makes the following findings.

(1) Lombardozzi's financing of the payoff amounts due Reservoir and Lifeboat would have been approvable if timely application had been made. It would have been to Debtor's advantage to have its secured debt held by a party with an interest in seeing that the business prospered, rather than an entity whose sole concern was timely repayment of its loan. Since Lombardozzi's application for approval of these payments was made only a short time after he had actually made payment, and since no objection was filed to it, it is reasonable to assume that none would have been filed to a timely application and so the order thereon would have been similarly approved.[5]

(2) It is difficult to speculate about whether creditors were benefitted or harmed by the continuation of business that was fostered by the loan. The time period in which benefit or harm should be assessed is really only the few weeks between

---

[5]

The order approving Lombardozzi's motion was ministerially handled by the Clerk of the Bankruptcy Court, who applied a facsimile signature stamp to the Order, since no objections were filed.

11

Case 1:96-bk-00012-JJT    Doc 307    Filed 08/14/02    Entered 08/20/02 00:00:00    Desc
Converted from NIBS HB    Page 11 of 16

the making of the loan and the application for approval of the assignment. The Court has no real evidence as to whether the business gained or lost money or assets during that period. Since that application was filed within a few weeks after the loan was made, it would not appear that any significant loss would have been suffered by creditors as a result of the continuation of business during that short period.

(3) It is also difficult to speculate about Lombardozzi's beliefs at the time of the loan regarding the necessity for prior Court approval of the loan. The case had been in bankruptcy for over a year prior to that time. Lombardozzi was an active participant in all phases of the case. He had been previously involved in Signature Kitchens' bankruptcy. Thus, it would appear that he had a knowledge base greater than the average debtor or lender as to the need for Court approval of such matters. In contrast to the assumptions about his knowledge that might be made from these factors, Lombardozzi seemed genuinely surprised at trial to learn of the high degree of importance that is attached to prior approval. It is certainly understandable that he might have difficulty with the notion that by paying off two high-interest financing arrangements, he was doing something improper. And again, the fact that he did file a Motion for Court approval a fairly short time after he made the loan lends support to the integrity of his intent in making the loan.

12

(4) The record contains sufficient evidence that the loan was in fact made, and the Motion to approve it was made within a few weeks thereafter. It would seem inordinately punitive to now preclude Lombardozzi from effectuating the secured status which this Court had previously approved simply because it now appears that the loan was made a few weeks before the Motion.

For all of these reasons, the Court will treat the $450,000.00 note as having created a security interest. It will recognize that secured claims incurred in a Chapter 11 case may receive treatment as a Chapter 7 administrative claim under §503(b). The Court has heard no argument, other than those about timeliness, that would preclude administrative claims treatment for this loan. Therefore, such treatment shall be afforded the $450,000.00 note, but only to the extent of the sum that Lombardozzi paid to Reservoir and Lifeboat. As indicated earlier, that total sum was $272,384.00.

Unfortunately, this is not the final word about the $450,000.00 note. As the UST points out, interest at the rate of 20% was paid to Lombardozzi on this note from January through October, 1998, in the amount of $13,333.00 per month. The note does not support such a payment. Similarly, from April until June, 1999, interest was paid in the amount of $3,000.00 per month for a total of $9,000.00. From August to October, 1999 it was paid in the amount of $6,000.00 per month for a total of $18,000.00. No interest rate was ever stated

13

in Lombardozzi's motion for approval of his assignment of the Reservoir and Lifeboat loans. Thus, creditors had no notice that interest was to accrue at all. The Court cannot permit a creditor to simply name his interest rate and collect it at his whim. Since Lombardozzi's Motion to approve the assignment did not state any interest rate, it must be taken that he did not intend to require interest to be paid. Since he later received unauthorized interest payments, his administrative claim will be reduced by that amount of interest which he received, $160,333.00 ($133,000.00 + $9,000.00 + $18,000.00). Lombardozzi's administrative claim will therefore be fixed at $112,051.00 ($272,384.00 - $163,333.00).

The third advance is one alleged to have been made in October, 1998. No contemporaneous note exists to support this advance. However, on September 15, 1998, Debtor filed a motion seeking approval of a financing arrangement by which Lombardozzi would loan Debtor up to $300,000.00. The Motion indicated that the loan was necessary for the continued operation of the business, including the payment of wages. Although the Motion contained no reference to the terms of the loan, e.g. period of repayment or interest rate, the Motion was ministerially approved on October 13, 1998, since no objections had been filed to it.

On November 2, 1998, $200,000.00 was deposited into Debtor's account. The account statements indicate that on

14

October 27 and 28, 1998, Debtor had paid Signature Kitchens some $198,184.34. on notes the latter held. Thus, the loan which the Court approved had not gone to pay wages or other operational expenses for the business, it went to make payments on another loan - a loan which had not been approved by the Court pursuant to §364. Under these circumstances, the Court cannot grant administrative claims status to the $200,000.00. To do so would be to allow Lombardozzi to convert a non-approved loan into an approved one.

In addition, while the September 15, 1998 Motion for financing was timely filed and was not objected to, there is no note to prove the terms of the loan. To allow an undocumented loan made in a Chapter 11 case to be paid as an administrative expense after the case has converted would be to give a free hand to the lender to create terms for that loan without notice to creditors, rendering the notice requirements of §364 meaningless and leaving entirely too much room for abuse by lenders who are also insiders.

Finally, Lombardozzi clearly mislead the Court in his September 15, 1998 Motion when he indicated that the financing was needed to pay wages and other claims related to the day-to-day operation of the business. In fact, there is no evidence that he used the approved loan to pay such claims. The Court cannot countenance such fraudulent conduct.

For all of these reasons, the Order of October 28, 1998 will be, and hereby is, VACATED.

15

## Conclusion

Since the Trustee's Motion to abandon the note is being denied, the estate will retain an interest in the note. The note is to be valued at the difference between all administrative claims and the value of the estate's assets. The estate owes administrative claims in the amount of $307,720.00 ($119,669.00 + $112,051.00). The assets are worth $898,279.00. Thus, the estate's interest in the note has a value of $590,559.00.

BY THE COURT

M. BRUCE McCULLOUGH
BANKRUPTCY JUDGE

HARRISBURG, PENNSYLVANIA