IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | CHAPTER SEVEN |
| | : | |
| RJC INDUSTRIES, INC., | : | BANKRUPTCY NO.: 1-96-bk-00012 |
| | : | |
| DEBTOR | : | |
| | : | |
| OFFICE OF THE UNITED STATES TRUSTEE, | : | |
| | : | |
| PLAINTIFF | : | |
| | : | |
| vs. | : | |
| | : | |
| JOHN LOMBARDOZZI, | : | |
| | : | |
| DEFENDANT | : | **ADVERSARY NO.: 1-01-ap-00283A** |

# <u>OPINION</u>

These matters have come before me by way of a convoluted history, litigated over

the past six years, involving two prior bankruptcy judges and a District Judge.

**History**

In about September 1995, John Lombardozzi (hereinafter "Lombardozzi")[1]

purchased all the stock of RJC Industries, Inc. (hereinafter "RJC" or "Debtor") from John

Chapel for $100,000.  (Transcript of 7/1/02 at 113-114.)  RJC traded as American Stair

Products and Armstrong Cabinet Shop.  (Transcript of 11/17/04 at 39.)  Shortly thereafter,

RJC filed for Chapter 11 relief on January 3, 1996.  On November 19, 1999, RJC moved

---

[1]  References to "Lombardozzi" will refer to John Lombardozzi.  When John's father Steve is
referred to, his whole name will be used.

[m:\users\cathy\...\opinions\1-01-ap-00283_RJC_UST_v_Lombardozzi.wpd]

to sell virtually all of its assets to Lombardozzi, the principal and sole stockholder of the Debtor. The United States Trustee objected, which objection was resolved by Stipulation (1-96-bk-00012 at ECF Doc. #257) approved on January 20, 2000, by Bankruptcy Chief Judge Robert J. Woodside, since deceased. The terms of that Stipulation play a pivotal role in the disposition of this case. An important aspect of that Stipulation was the credit against the sales price allowed Lombardozzi for legitimate administrative claims against the Debtor. While there had been some Orders issued by Judge Woodside with regard to those administrative claims, their efficacy was challenged in an adversary proceeding by the United States Trustee against Lombardozzi filed November 21, 2001, to Adversary No. 1-01-ap-00283. Paragraph 15 of the Stipulation, among other things, provided that Lombardozzi would execute a note payable to RJC for the full value of the assets transferred to him to protect the estate should future litigation result in the disallowance of all or a portion of the administrative credits claimed by Lombardozzi. The United States Trustee's adversary challenges those administrative claims, arguing that those advances were either investments or loans that should be equitably subordinated to other creditors[2]. RJC continued in Chapter 11 until March 13, 2000, when it converted to Chapter 7. On September 1, 2000, the Chapter 7 trustee sought permission to abandon that note as being of inconsequential value to the estate. (1-96-bk-00012 at ECF Doc. #277.) The United States Trustee objected to that request. (1-96-bk-00012 at ECF Doc.

---

[2] The equitable subordination claim was subsequently withdrawn on June 10, 2004.

#279.)  These matters came to trial before visiting Bankruptcy Judge, M. Bruce McCullough.  The trial focused on the legitimacy of several discrete categories of advances from Lombardozzi to RJC as follows:  (1) $350,000, primarily in the nature of insider advances in 1996-1997, (2) $450,000 of advances in December 1997, (3) the interest on those $450,000 advances, (4) an advance of $200,000 in 1998, and, finally as referenced in the Stipulation, (5) approximately $195,000 worth of miscellaneous expenditures identified by exhibit referenced in the sale motion.

On August 14, 2002, Judge McCullough issued his Memorandum and Order of Court.  The Order disallowed the $350,000 advances as failing to have prior court approval.  The Court awarded Lombardozzi $112,051 of the $450,000 advances by concluding that only $272,384 was owed on the debt to be assigned and $160,333 of improperly paid interest to Lombardozzi must be deducted from that debt.  Interest was disallowed on the advances.  The $200,000 loan to RJC was also disallowed by the Court since Judge McCullough concluded it was not properly utilized by the Debtor.  The claims, identified in the exhibit attached to the sale motion, were not addressed.

Subsequently, that Order was appealed to the District Court, which reversed and remanded the issues to be decided in accordance with its appellate findings and conclusions.  I now become the third bankruptcy judge to address these issues.  I do so *seriatim*.

**Item 1. $350,000 Loan**

The record indicates that the sources of these advances to RJC came from Lombardozzi ($50,000); Steve Lombardozzi, John's father, ($120,000); and Signature Kitchens[3], Lombardozzi's wholly owned company ($180,000). (Transcript of 7/1/02 at page 163.) The Bankruptcy Court did not preauthorize any of these advances. It was for that very reason that Judge McCullough declined to recognize these advances as legitimate administrative claims under 11 U.S.C. § 364(b). (Memorandum and Order of Court, McCullough, J., at 7-10 (1-01-ap-00283 at ECF Doc. #18).) Rather, Judge McCullough characterized these funds as a "businessman's investment."

In reversing Judge McCullough, the District Court opined that there were two methods by which loans to the Debtor could be authorized. 11 U.S.C. § 364 provides:

(a) If the trustee is authorized to operate the business of the debtor under section 721, 1108, 1203, 1204, or 1304 of this title, unless the court orders otherwise, the trustee may obtain unsecured credit and incur unsecured debt in the ordinary course of business allowable under section 503(b)(1) of this title as an administrative expense.

(b) The court, after notice and a hearing, may authorize the trustee to obtain unsecured credit or to incur unsecured debt other than under subsection (a) of this section, allowable under section 503(b)(1) of this title as an administrative expense.

11 U.S.C.A. § 364

---

[3] The Laminate Company, Inc. traded as Signature Kitchens, Signature Companies and American Stair and Cabinetry. (Transcript of 11/17/04 at 42.) Throughout this trial, this entity was most often referred to as Signature Kitchens, a name which I will utilize in this Opinion.

Although § 364(b) requires prior court approval, § 364(a) does not, if incurred in the ordinary course of the debtor's business. It was the failure to examine § 364(a) that, in part, required a remand of this case to the bankruptcy court. I am, therefore, directed to evaluate whether these advances could constitute administrative claims arising "in the ordinary course of business" under 11 U.S.C. § 364(a).

There is no statutory definition of the terminology, "ordinary course of business." I observe that cases examining this phrase have varied in scope and are far from consistent. As such, I conclude that there is sufficient ambiguity to allow us to resort to legislative history to garner congressional intent. I also observe that debts incurred in the "ordinary course" have been discussed in conjunction with a multi-element review of the safe-harbor provisions of the preference defense in 11 U.S.C. § 547(c)(2)(a). In speaking of § 547(c)(2), it has been said that, "[t]he purpose . . . is to leave undisturbed normal financial relations." H.R.Rep. No. 595, 95th Cong., 1st Sess., reprinted in 1978 U.S. Code Cong. & Ad. News 5787, 6329. Congress has further suggested that one distinction between § 364(a) and § 364(b), which requires notice, is that § 364(b) is to be used "to obtain a substantial loan in an operating case." App. C Alan N. Resnick, et al., *Collier on Bankruptcy, Legislative History-1978 Act* App. Pt. 4-1480 (15th ed. rev'd).

In fairness to Lombardozzi, I allowed the record to be reopened on remand to accept evidence of the ordinary course. Indeed, Lombardozzi introduced expert

testimony as to the debtor-creditor relationship between a small market company[4] (revenues under $10 million dollars) and its principal. As I did at trial, I again overrule the United States Trustee's objection to the testimony of this witness.

Whether this satisfied the ordinary course standard requires analysis of applicable case law.

Initially, I find that it is the creditor's burden to produce evidence of industry norms. *In re Allegheny Health Educ. and Research Foundation*, 127 Fed. Appx. 27 (3d Cir. 2005).

Turning to the components of the $350,000 advances, I find the following specifics in the record.[5]

01/96 - Signature pays Gruber Systems $769.84 (Armstrong[6] payable).

01/04/96 - Steve Lombardozzi writes check in favor of RJC for $35,000.

02/96 - Signature pays Gruber Systems $5,045.45 and associated freight $134.29 (Armstrong payable).

02/21/96 - Steve Lombardozzi writes check in favor of Armstrong Cabinet for $15,000.

---

[4] Middle market company was defined by the expert as having annual revenue between $10,000,000 and $200,000,000. (Transcript of 11/15/04 at 117.)

[5] The transfers from Signature Kitchens to Lombardozzi affiliates is set forth on Lombardozzi Exhibits 2 and 5 and borders on incomprehensible. The testimony is of little assistance in clarifying these figures. Their speculative nature gives further support to the conclusions reached in this decision.

[6] Used in presumed reference to the RJC trade name Armstrong Cabinet. (Transcript of 7/1/02 at 138.)

04/96 - Signature pays Dunn Computer ($1827.71, $62.70, $87.00); Berenson ($405.07), and Zukowski ($206.20) (Armstrong payables).

06/05/96 - Steve Lombardozzi writes check in favor of Armstrong Cabinet for $40,000.

6/11/96 - Signature transfer to RJC account for $50,000.

08/96 - Signature presumably paid various Armstrong bills totaling $14,913.55.

8/21/96 - Signature check to Armstrong Marble[7] for $30,000.

9/25/96 - Signature check to Armstrong Marble for$15,986.94.

10/07/96 - Steve Lombardozzi writes check in favor of Armstrong Cabinet for $30,000.

10/30/96 - Signature check to Armstrong (RJC) for $41,461.74.

11/22/96 - Signature check to American Stair (RJC) for $20,000.

01/06/97 - John Lombardozzi writes check, presumably in favor of RJC for $50,000.

Lombardozzi 2002 Exhibit #2 at pages 8-20 purportedly documents the $180,000 advance by Signature Kitchens to RJC.

It was significantly subsequent to these advances, on December 23, 1997, that Lombardozzi, as President of RJC, executed a note in favor of himself personally for the sum of $350,000 at an interest rate of 12%.  (Lombardozzi 2002 Exhibit #3.)

---

[7]  I can find no reference to the connection between Armstrong Marble and RJC.

Notwithstanding that documentation, Lombardozzi sought interest of 20% from RJC. (Transcript of 7/1/02 at 200.)

In order for these advances to be approved as administrative expenses of the Debtor without court approval, I must find that the extension of this funding was done in the ordinary course.

These transactions were among insiders or affiliates as those terms are defined at 11 U.S.C. § 101. Insider transactions are carefully scrutinized. *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939). These advances were far from stereotypical and ordinary. There was no pattern by which Lombardozzi advanced money to RJC. Monies were advanced through various sources and, later, were manipulated using book entries to reflect loans directly from Lombardozzi. Steve Lombardozzi made four separate transfers to Armstrong Cabinet, a trade name for RJC. Presumably, at a later time, these advances were characterized as loans to John Lombardozzi who, thereafter, loaned the monies to RJC. Signature Kitchens, another of Lombardozzi's wholly owned companies, "advanced" funds to RJC presumably by directly paying RJC bills and also by writing checks to Armstrong Marble. Again, later on, these advances were characterized as loans from Signature to John Lombardozzi and then from Lombardozzi to RJC.

The actual documentation for this "loan" from Lombardozzi to RJC was not made until December 23, 1997, well after the fact. (Lombardozzi 2002 Exhibit #3.)

Courts have utilized a two prong test in determining whether a transaction has occurred in the ordinary course. This test adopts a vertical and horizontal approach. 3

Collier on Bankruptcy, ¶ 364.02[1] at 364-5 (15th ed. rev'd).  This approach has been embraced by our circuit.  *In re Roth American*, 975 F.2d 949, 952 (3d Cir. 1992).

The horizontal approach to ordinary course requires the court to review an industry-wide perspective and determine whether the conduct referenced is typical in the specific trade covered by the debtor's business.  In this approach, I am required to determine whether the transaction at issue is of a type that similar enterprises would engage.  It need not be a regular occurrence, merely ordinary in the industry.  Notwithstanding a contrary argument, I find that Lombardozzi offered no evidence of industry practice, therefore, he cannot rely on this approach.

On the other hand, the vertical approach focuses more on the creditor's reasonable expectations.  Typically based on the debtor's business conduct rather than any industry's normal operation, the focus with the vertical approach is with the anticipation of creditors dealing with the debtor as to the type of transactions that the debtor might utilize.  With regard to the vertical approach, courts consider whether a transaction is consistent with the debtor's prepetition transactions and conduct.  *In re Roth American,* 975 F.2d 949, 953 (3d Cir. 1992).  The record references little RJC prepetition creditor relationship with Lombardozzi or any other insider.

RJC did offer expert testimony to the effect that it was typical for small business entities to depend on insider loans.  (Transcript of 11/15/04 at 146.)  While that conclusion can be found to be supportable, the Debtor's practice of receiving funds from multiple sources subject to future categorization and whimsical interest rates appears far

from ordinary.  Lombardozzi has simply failed to maintain his burden of showing that these advances were in the ordinary course, either within its industry or consistent with its creditor's expectations.

The only thing ordinary in these series of transactions was their unpredictability and randomness as to vehicle, source, status, terms and the like.  At the hearing before Judge McCullough, Lombardozzi testified that, until the accountants examined the transaction in hindsight at the end of the year, he would not know how to characterize it. (Transcript of 7/1/02 at 159.)  He testified about some tacit understanding that funds advanced by RJC's general manager and Lombardozzi's father to RJC were really loans to Lombardozzi who loaned funds to RJC.  That same understanding governed direct payments of RJC bills by Signature.  Such an approach is too convenient to represent anyone's standard of "ordinary course."  This "after-the-fact" paper trail within the various companies is of little assistance in identifying the nature of the transactions at the time they occurred.

I conclude that this $350,000 series of advances cannot qualify as ordinary course loans to the Debtor.

The District Court hints at the possibility that, perhaps, these advances should be considered approved after the fact or *nunc pro tunc*.  (Memorandum, Connor, J., filed October 7, 2003 at 13-15 (1-01-ap-00283 at ECF Doc. #28).)  Consideration of that option may be entertained, if indeed, I find that these advances were loans and not equity investments as argued by the United States Trustee and found by Judge McCullough.

Our circuit has concluded that a bankruptcy court has the power to re-characterize a claim from debt to equity. *In re SubMicron Systems Corp.*, 432 F.3d 448 (3d Cir. 2006). While the circuit recognized the reliance by various other courts on a series of "multi-factor tests," the overarching inquiry as to whether an advance should be considered an infusion of equity is the intent of the parties gleaned from what they say, what they do, and the economic reality of the situation. *Id.* at 456.

When Lombardozzi bought the company from John Chapel, RJC was apparently in trouble. Lombardozzi thought he could renegotiate a better financing package from Sam Armstrong, the principal lender. When that didn't happen, RJC filed for relief under Chapter 11 to stave off Armstrong's liquidation of secured assets. Within days, Lombardozzi's father and general manager, Steve Lombardozzi, advanced funds to RJC without any written documentation of terms. Steve Lombardozzi never testified at trial, so his intention remains obscure. Lombardozzi testified that the intention of the parties was, generally, that Steve Lombardozzi's advances were to be considered to be on Lombardozzi's behalf and the details would await a later discussion with the accountants. (Transcript of 7/1/02 at 159.) RJC was significantly undercapitalized throughout this time period, maintaining a negative equity. (Lombardozzi 2002 Exhibit #8.) Written loan agreements with terms were not drafted until long after the advances were made. (Transcript of 7/1/02 at 199.) Interest rates utilized by the parties bore no relationship to the amounts specified in the documentation. (Transcript of 7/1/02 at 216-7 and Lombardozzi 2002 Exhibit #3.) Of course, an influential factor toward concluding that

these advances were capital contributions is the identity of interest between Lombardozzi as creditor and as investor.

In fact, my analysis of the details of the transactions fully supports the argument of the United States Trustee that these funds were no more than investment vehicles and I so find. I conclude that the entire $350,000 investment represents an equity investment.

Having so found, there is no need to determine whether *nunc pro tunc* approval is warranted under 11 U.S.C. § 364(b), since a finding that this was an equity investment precludes a conclusion of a debtor-creditor relationship. *In re SubMicron Systems Corp*., 432 F.3d 448 (3d Cir. 2006).

**Item 2. $450,000**

On February 27, 1996, less than 2 months after bankruptcy, the Debtor sought authority to obtain post-petition financing from Reservoir Capital Corporation and The Lifeboat Company, LLC. (1-96-bk-00012 at ECF Doc. #22.) The financing required the personal guarantee of Lombardozzi. It was extended for one year by Order of January 30, 1997. (1-96-bk-00012 at ECF Doc. #77.) On December 30 and 31, 1997, Lombardozzi purportedly advanced $450,000 to RJC. (Transcript of 7/1/02 at 183.) Shortly thereafter, RJC satisfied the obligations owing Lifeboat and Reservoir. Notwithstanding this apparent satisfaction, the assignment of the Lifeboat and Reservoir obligations were requested by motion on January 28, 1998. (1-96-bk-00012 at ECF Doc. #142.) On March 4, 1998 that motion was approved by Judge Woodside. (1-96-bk-00012 at ECF Doc. #150.) More specifically, Lombardozzi was authorized to pay off the balances

owing Lifeboat and Reservoir and receive an assignment of any "ownership interests/security interests" in receivables and inventory of RJC.

In the motion seeking assignment, counsel for RJC, Lombardozzi's wholly owned company, alleged that "[t]he only conditions under which John Lombardozzi will pay the balances due Reservoir Capital Corporation and The Lifeboat Company, LLC is to take an assignment of all rights presently enjoyed by The Reservoir Capital Corporation and The Lifeboat Company, LLC with respect to its ownership and/or security interest in the above collateral of the debtor-in-possession." (1-96-bk-00012 at ECF Doc. #142 at ¶ 5.) This document was filed January 28,1998. Notwithstanding that allegation, the record of this hearing suggests that no money was due and owing either Lifeboat or Reservoir when that motion was filed. (Transcript of 7/1/02 at 43.) The failure to indicate in the underlying motion that the "balance" to be paid Lifeboat and Reservoir in order to secure an assignment of their rights was *zero* displays a shocking lack of candor, at best.[8] Moreover, while RJC satisfied the Lifeboat and Reservoir loans with funds advanced from Lombardozzi, neither Lifeboat nor Reservoir effectuated an assignment of the obligations referenced until September 1999, twenty months after their obligations were satisfied. (Transcript of 7/1/02 at 220.)

In his testimony, Lombardozzi tries to link the $450,000 advances to RJC in December 1997, as the equivalent of direct payments to Lifeboat and Reservoir and also

---

[8] The deposition of Robert Knupp, Esq. was advanced to establish, *inter alia*, that Judge Woodside was generally aware of Lombardozzi's advances. I found that testimony to be of marginal value in light of the contents of the Motion.

tries to effect a retroactive application of Judge Woodside's March 4, 1998 Order, which

factually has no application with regard to the theretofore satisfied debt to Lifeboat and

Reservoir.  Moreover, Lombardozzi acknowledges that of the $450,000 advanced to RJC,

$350,000 went to Lifeboat and Reservoir, $60,000 went back to Lombardozzi for interest

owing by RJC, and the balance was used for "administrative" expenses.  (Transcript of

7/1/02 at 197.)  The monthly operating statement for December 31, 1997 (United States

Trustee Exhibit 10), however, shows a balance due to Reservoir of $192,384.87 (line item

21) and $80,000 owing Lifeboat (line item 17) or a total of $272,384.87 and not the

$450,000 referenced in the promissory note.  (Lombardozzi 2002 Exhibit #3.)  See also

Transcript of 7/1/02 at 44.  The District Court, on appeal from the August 14, 2002

decision of Judge McCullough, "mooted" Judge Woodside's Order of March 4, 1998.

(Memorandum, Connor, J., filed October 7, 2003 at 3 (1-01-ap-00283 at ECF Doc. #28).)

Moreover, even if that disposition by the District Court was dicta and not binding on me,

Judge Woodside's Order had no impact since the assignments contemplated by the Order

were never supported by consideration.  In point of fact, at the time of Judge Woodside's

Order, there existed no debt in favor of Reservoir or Lifeboat which could be assigned to

a third party.  Put quite simply, the loan was satisfied prior to the March 4, 1998 Order of

Judge Woodside, rendering that Order meaningless.

 Furthermore, the District Court was critical of Judge McCullough's partial

allowance of the advance, *nunc pro tunc*, for $112,051.00[9].  The District Court found that the bankruptcy court *is* capable of allowing *nunc pro tunc* relief relative to § 364(b) financing.  Nonetheless, the District Court held that the bankruptcy court applied an "insufficiently rigorous" standard to allow retroactive validation.  Consistent with the District Court Opinion, I will proceed to analyze the January 28, 1998 Lombardozzi motion as if it was submitted requesting *nunc pro tunc* relief.

Initially, I must find that I would have granted approval if timely filed.  I must further find that creditors have not been damaged by the continuation in business.  Further, the proponent of the loan must "honestly believe" that they had authority to enter into the transaction.  *In re American Cooler Co.*, 125 F.2d 496, 497 (2d Cir. 1942),  *In re Lehigh Valley Professional Sports Clubs, Inc.* 260 B.R. 745, 750 (Bkrtcy. E.D.Pa. 2001). I must also find the existence of "extraordinary circumstances" that justify an untimely filing, such as time pressure to extend the loan prior to securing court approval.  *In re F/S Airlease II v. Simon*, 844 F.2d 99, 105-08 (3d Cir.), *cert. denied*, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988),  *In re Arkansas*, 798 F.2d 645 (3d Cir. 1986).

I understand fully the circumstances under which Lombardozzi would be motivated to undertake the financing roles theretofore occupied by Reservoir and Lifeboat.  Lombardozzi did briefly testify that, on behalf of RJC, he was unable to secure alternate sources of funding.  (Transcript of 7/1/02 at 177.)  While the balance sheets on

---

[9] Judge McCullough's calculation started with the $272,384 figure laid out in the December 31, 1997 monthly operating report which was then reduced by "unauthorized interest payments."

Case 1:96-bk-00012-JJT    Doc 390    Filed 04/28/06    Entered 04/28/06 10:29:21    Desc
Main Document      Page 15 of 22

record show a deterioration of the Debtor's financial strength, to the detriment of creditors, I can conceivably find that, had this application been timely presented, the bankruptcy court would have approved the substitution, albeit on the same terms as extended by Reservoir and Lifeboat. Nevertheless, Lombardozzi was at all times represented by an experienced bankruptcy attorney who should have known that *nunc pro tunc* applications are discouraged. Lombardozzi was familiar with bankruptcy, having filed for his solely owned company, Signature Kitchens, which was in bankruptcy for sixteen months. (Transcript of 7/1/02 at 201.) These are specific factors weighing heavily against allowing approval of this loan *nunc pro tunc*. *F/S Airlease II, Inc. v. Simon*, 844 F.2d 99, 107 (3d Cir. 1988). There was an absence of testimony that a timely application could not have been made because of time pressure. In fairness to Lombardozzi, he did testify that he thought his professionals were addressing this. Whether this was naivete on Lombardozzi's part, or just a callous disregard of protocol, is not critical. It is just these circumstances that militate against a finding of *nunc pro tunc* approval of the $450,000 advances. On the other hand, still available to Lombardozzi is the possibility that these advances may comport to the ordinary course provisions of 11 U.S.C. § 364(a).

Lombardozzi, again, strains the concept of "ordinary course" by ignoring his own documentation and finding a different way to channel funds to the Debtor. The motion seeking authorization to pay Reservoir/Lifeboat clearly states that Lombardozzi "will personally pay all amounts due and owing Reservoir Capital Corporation and The

Case 1:96-bk-00012-JJT    Doc 390    Filed 04/28/06    Entered 04/28/06 10:29:21    Desc
Main Document      Page 16 of 22

Lifeboat Company, LLC." (1-96-bk-00012 at ECF Doc. #141 at ¶ 4.) The United States Trustee analyst testified, however, that on December 31, 1997, wire transfers of $150,000 and $200,000 occurred from the account of Lombardozzi directly to RJC, not the creditors. (Transcript of 11/1/02 at 47.) See, also, Lombardozzi 2002 Exhibit #2. One hundred thousand dollars ($100,000) was received by RJC from an unknown source, possibly Lombardozzi's father, Steve. (Transcript of 7/1/02 at 47 and 239.) RJC, in fact, paid Lifeboat/Reservoir directly with RJC checks. The Lifeboat and Reservoir loans were thus satisfied so nothing remained to "assign" to Lombardozzi. *F/S Airlease II, Inc. v. Simon,* 844 F.2d 99, 101 (C.A.3 (Pa.) 1988). It was almost two years after these monies were paid to RJC that a new security agreement was actually executed in favor of Lombardozzi. (Transcript of 7/1/02 at 220.) Interest paid to Lombardozzi was not consistent with the interest rates provided by the promissory note. (Lombardozzi 2002 Exhibit #3.)

I, again, find that this transaction cannot be considered in the ordinary course under the standards earlier discussed.

**Item 3.  Interest on $450,000 loan**

Having heretofore found that this $450,000 loan was not made in the ordinary course, nor made pursuant to prior court order, nor subject to *nunc pro tunc* approval, I can only conclude that interest "owing" on these funds is not the Debtor's obligation.[10]

---

[10] I recognize that the record indicates that a substantial amount of interest has been paid to Lombardozzi or his affiliates by the Debtor. The pleadings do not seek redress regarding these funds, therefore, I shall not factor them into my findings.

**Item 4.  $200,000 loan**

On September 15, 1998, RJC filed a motion seeking authorization to borrow money from Lombardozzi for up to $300,000 in order to meet operating expenses. (1-96-bk-00012 at ECF Doc. #162.)  It was approved by Judge Woodside on October 13, 1998. (1-96-bk-00012 at ECF Doc. #172.)  On November 2, 1998, $200,000 was deposited into the RJC account.  It was noted on the record, however, that RJC, on October 27 and 28 of 1998, paid Signature Kitchens $198,184.34 in alleged loans from that corporation.  In effect, the $200,000 advance to RJC was used to pay Signature.  (Transcript of 7/1/02 at 221.)  The United States Trustee argued that the loan was not used for the purposes identified in the motion.  Judge McCullough vacated Judge Woodside's Order of October 13, 1998.[11]  I view the District Court's reversal of Judge McCullough's opinion as effectively reinstating Judge Woodside's October 13, 1998 Order.  The District Court's Order of October 6, 2003, reversing and remanding to the bankruptcy court, effected a requirement of a relitigation of the issues *as though they had not been determined before*, pursuant to the principles of law enunciated in the appellate opinion."  (emphasis theirs)  *Kool, Mann, Coffee & Co. v. Coffey* 300 F.3d 340, 355 (C.A.3 (Virgin Islands) 2002).  I also note that no motion under Federal Rule of Bankruptcy Procedure 9024 (Federal Rule 60) has been filed challenging Judge Woodside's Order of October 13, 1998.  I believe that I am bound to recognize that Order as law of the case.  While the

---

[11]  Judge McCullough's Opinion referenced "the Order of October 28, 1998" which I view as a typographical error.

October 13, 1998 Order granted the motion for post-petition financing in favor of

Lombardozzi up to $300,000, the parties have agreed that only $200,000 was advanced.

The Order clearly gives lien status to the extent such would not interfere with a prior lien

by Sam Armstrong. Lombardozzi acknowledges that the $200,000 unsecured debt owing

Signature has been replaced with a $200,000 secured obligation owing Lombardozzi.

(Transcript of 7/1/02 at 222.)

### Item 5. $195,000 advance

On November 19, 1999, RJC filed a motion to sell all of its assets to Lombardozzi

or his assignee in exchange for satisfying various enumerated administrative payables

($185,169.20 + estimated sales tax liability of $10,500) as well as satisfying RJC

administrative claims owing to Lombardozzi. (1-96-bk-00012 at ECF Doc. #236.) After

the United States Trustee objected, a Stipulation was filed and approved by Judge

Woodside on January 20, 2000. (1-96-bk-00012 at ECF Doc. #257.) Paragraph 8 of the

Stipulation reads:

> The consideration for the transfer of assets as provided for herein is the
> assumption and payment of unpaid Chapter 11 expenses of administration
> of the debtor-in-possession at the time of the transfer, said administrative
> expenses being enumerated in the motion for Sale or Transfer and contained
> in an Appendix attached to said Motion.

That paragraph's specific reference to the fact that the consideration for the asset transfer

is the administrative expenses "at the time of the transfer" as "enumerated in the Motion"

and "contained in [the] Appendix" limits itself to these parameters. The transfer date is

specified by paragraph 5 of the Stipulation to be December 7, 1999. While the credit to

be determined with regard to the sale of assets was clearly defined by the terms of the Stipulation, there was no such agreement that the administrative claim of Lombardozzi should be likewise capped.  It is for that reason that this Opinion is limited to the portion of such administrative claim (or secured claim) that can be used as a credit toward the sale of the Debtor's assets.

At the time of the initial hearing before Judge McCullough, Lombardozzi and the United States Trustee appeared to agree that the items identified in the appendix to the sale motion were administrative in nature and would be allowed as a credit so long as Lombardozzi established that they were actually paid.  (Transcript of 7/1/2002 at 193.) The testimony at the subsequent hearings after remand established that $173,660.03 was actually paid and should be allowed as a credit against the purchase of RJC assets. (Transcript of 11/17/04 at 32.)

**Chapter 11 administrative allowance over and above amount approved as a credit toward asset purchase**

The final category of dispute addresses Lombardozzi's Motion for Approval of the Payment of Certain Invoices as Administrative Expenses (1-96-bk-00012 at ECF Doc. #308) and Supplementary Motion for Allowance of Administrative Expense (1-96-bk-00012 at ECF Doc. #323).  In addressing these motions, the Court is asked to determine the total administrative claim of Lombardozzi that is not otherwise credited toward the asset purchase by reason of the Stipulation.  While the motion filed as ECF Doc. #308 seeks a specific $340,000 award, the motion filed to ECF Doc. #323 attempts to bootstrap

a claim for legal fees of Lombardozzi as arising from collection efforts required by Lombardozzi as successor to Reservoir Capital Corporation, approved by the Court on March 4, 1998.

While this motion was scheduled for hearing immediately after the remanded hearing, the Court concluded that testimony on that issue would be premature if taken prior to the disposition of Adversary No. 1-01-ap-00283, and the panel trustee's motion to abandon the note.

**Conclusion**

For the reasons in this Opinion, the panel trustee's motion to abandon the note will be denied.

Moreover, judgment will be rendered in favor of the United States Trustee regarding the above captioned Adversary Complaint in regard to Item 1, the $350,000 advances; Item 2, the $450,000 advances; and Item 3, interest on the $450,000 advances. Regarding Item 4, Lombardozzi is awarded a $200,000 administrative allowance. With regard to Item 5, Lombardozzi is awarded an administrative allowance of $173,660.03. Each of these last two items shall be allowed as a credit toward the purchase of assets as set forth in the Stipulation of January 20, 2000.

To the extent that the Motion for Approval of the Payment of Certain Invoices as Administrative Expenses (1-96-bk-00012 at ECF Doc. #308) and the Supplementary Motion for Allowance of Administrative Expense (1-96-bk-00012 at ECF Doc. #323) have not been addressed by this Opinion, a **TELEPHONE CONFERENCE** is set on

these Motions for **Friday**, **July 21, 2006**, at **10:00** o'clock A.M.  The Court directs counsel for Movant, John Lombardozzi, to arrange and initiate this conference call with all parties in interest.  The Court can be contacted at 570-826-6336.

An Order will follow.

Date:   April 28, 2006

John J. Thomas, Bankruptcy Judge

*This opinion is electronically signed and filed on the same date.*

(CMS)